UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TIMOTHY J. KELLY,

                Plaintiff,

v.                                              Case No.  5:04-cv-311-Oc-GRJ

JO ANNE B. BARNHART, Commissioner of
Social Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 9) and both parties have filed briefs outlining their respective positions.  (Docs. 15 & 17.)[1]  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits in July 2001,[2] claiming a disability onset date of July 3, 2001. (R. 70-72.) Plaintiff's application was denied initially (R. 49-50), and upon reconsideration. (R. 57-

---

[1] Plaintiff filed a Motion to Remand the Decision of the Commissioner of the Social Security Administration (Doc. 14) and a supporting Memorandum (Doc. 15.)  On October 12, 2004, the Court terminated Plaintiff's Motion to Remand as a pending motion and stated that it would consider Plaintiff's request for remand as part of the Court's determination on the merits.  (Doc. 16.)

[2] The exact date in July 2001 is unclear from the record.  July 16, 2001 was typewritten on the first page of the application, July 27, 2001 was handwritten on the first page of the application, and the application was signed and dated by Plaintiff on July 20, 2001.

58.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the

Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").

(R. 61.)  The ALJ conducted Plaintiff's administrative hearing on September 19, 2003.

(R. 30-44.)   The ALJ issued a decision unfavorable to Plaintiff on October 9, 2003 (R.

13-22.)  Plaintiff timely filed a request for review with the Social Security

Administration's Office of Hearings and Appeals.  (R. 6-7, 10.)  Plaintiff submitted

additional medical evidence to support his claim.  (R. 62-63.)  The Appeals Council

denied Plaintiff's request for review on May 7, 2004.  (R. 2-5.)  On July 6, 2004, Plaintiff

filed the instant appeal to this Court. (Doc. 1.)

### III. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[3] *See* 42 U.S.C. § 405(g).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does

---

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments

meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past

relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her

RFC, age, education, and past work) prevent her from doing other work that exists in

the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work

initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently exists in the

national economy.[17] The Commissioner may satisfy this burden by pointing to the grids

for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the grids when the claimant has

a non-exertional impairment which significantly limits his or her basic work skills or when

---

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[18] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

## IV. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on April 22, 1957 and was forty-six (46) years old at the time of the hearing.  (R. 17, 33.)  Plaintiff has a Bachelor's degree.  (*Id.*)  Plaintiff worked at Lockheed Martin as a supervisor of planning and control.  (R. 39, 93.)  Plaintiff contends that he has been unable to work since July 3, 2001 due to seizures and his status post

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker at 1003.

[21] Wolfe at 1077-78.

[22] *See id.*

[23] *See* Doughty at 1278 n.2.

left anterior temporal lobectomy that has affected his memory and his ability to learn new things.  (R. 40, 80).

Plaintiff has a long history of seizures. (R. 179-84.)  In efforts to control his seizures, Plaintiff had a left frontotemporal craniotomy[24] and an anterior temporal lobectomy[25] in February, 1995. (*Id.*)  Plaintiff had post-operative seizures in November 1999 and March 2001.  (R. 250.)[26]

On July 2, 2001, after suffering four seizures in approximately one week, Plaintiff saw Dr. Robin Gilmore at the Shands Neurology Clinic. (R. 150-51, 152-57.)  Plaintiff reported having seizures on June 22, 2001, June 23, 2001, June 24, 2001 and June 29, 2001.  (*Id.*)  Plaintiff reported that the seizures were followed by his typical postictal[27] headaches and that he experienced an aura[28] before the seizure on June 29, 2005. (*Id.*)  Plaintiff reported that his seizures are stress related.  (*Id.*) Dr. Gilmore requested that Plaintiff take leave from work for four weeks while they adjusted his therapy.  (*Id.*)

---

[24] Craniotomy refers to either the surgical cutting into the cranium or skull or the surgical removal of a piece of bone from the cranium.  *See* 2-CH-CZ Attorneys' Dictionary of Medicine 6655.

[25] Anterior temporal lobectomy removes up to 7 centimeters of the temporal lobe of the brain and is the most frequently performed operation used in the treatment of epilepsy.  *See* 2-E Attorneys' Dictionary of Medicine 3185.

[26] Plaintiff's wife discovered Plaintiff early in the morning on March 27, 2001, foaming at the mouth, eyes opened, blood on the pillowcase and incontinent of urine.  (R. 150.)  She further reported that he had tonic/clonic flexion extension of the extremities and that postictally he was confused and disoriented and fought with his son who was trying to restrain him. (*Id.*)

[27] Postictal refers to the period after a seizure.  *See* 4-P-PE Attorneys' Dictionary of Medicine 8421.

[28] An aura is a peculiar premonitory (foreboding) sensation experienced by some epileptic patients before the onset of an attack.  It occurs in about 50% of the cases and consists of visual and hearing disturbances, as the sight of sparks or bright colors, or the smelling of something burning.  There may also be cramps and many other painful or peculiar sensations.  *See* 1-A Attorneys' Dictionary of Medicine 12280.  Plaintiff described an aura as "a light or a feeling around me, mostly around my head . . . I guess it's a funny feeling"  (R. 34) and as "a feeling of a halo enveloping me."  (R. 329.)

On July 30, 2001, Plaintiff saw Dr. Gilmore. (R. 147-49.)  Plaintiff reported that he had not had any seizures during the past month, but complained of fatigue and noted that he had been napping in the afternoons.  (*Id.*)  Dr. Gilmore noted that Plaintiff would be allowed to return to work if he remained seizure-free for another two weeks. (*Id.*)

At his August 16, 2001 appointment with Dr. Gilmore, Plaintiff reported a seizure on August 11, 2001.  (R. 144-46.)  Plaintiff reported that he had an aura for approximately 2 minutes prior to the seizure.  He also reported uncharacteristic postictal agitation and noted that he has been very slow to recover from this event.  (*Id.*)[29]  Dr. Gilmore noted that Plaintiff drank one beer about two hours prior to this episode.  (*Id.*) She also noted that Plaintiff may have missed his morning anti-epileptic drug.  (*Id.*)  Dr. Gilmore opined that it was possible that the seizure and longer postictal period were related to the alcohol and potentially missed morning dose. (*Id.*)  Dr. Gilmore recommended that Plaintiff's sick leave be extended. (*Id.*)

On September 24, 2001, Plaintiff reported a "nocturnal event" approximately one week earlier in which he awakened with a headache and a bitten tongue.  (R. 254-56.) Plaintiff also reported another event two weeks earlier for which he took Valium and was able to prevent his seizure.  (*Id.*)  Dr. Gilmore made the assessment that Plaintiff was having "complex partial seizures which, while previously controlled, now become uncontrolled." (*Id.*)   Dr. Gilmore extended his medical leave for an additional two months.

---

[29] Plaintiff reported that the agitation lasted 5 to 10 minutes and that he got a pair of scissors that his wife removed from him.  (R. 144.)  The sheriff and paramedics were called.  (*Id.*)

On November 19, 2001, Dr. Gilmore noted that Plaintiff had auras on October, 25, 2001 and November 5, 2001.  (R. 251-52.)   Dr. Gilmore noted that Plaintiff may have suffered seizures on those days as well.  (R. 251.)  Plaintiff reported that he took his medication late on November 5, 2001.  (*Id.*)  Dr. Gilmore noted that his seizure disorder is "only under fair control." (*Id.*) Plaintiff also reported considerable fatigue, difficulty thinking and increased memory disturbance.  (*Id.*) In efforts to address these complaints, Dr. Gilmore made modifications to Plaintiff's medications and noted that she would consider repeating his neuropsychological testing when his medications were stable due to his complaints of increased memory disturbance. (*Id.*)[30]  Dr. Gilmore also noted that Plaintiff was medically disabled and would remain on medical leave indefinitely.  (*Id.*)

On December 17, 2001, Plaintiff was seen again by Dr. Gilmore.  (R. 245-47, 249-50.)  Plaintiff reported having a seizure on December 12, 2001, during which he allegedly physically abused his 17-year-old daughter.  (*Id.*)

At his appointment on January 14, 2002, Plaintiff reported that he had not had any seizures, time loss, auras or periods of disorientation since his previous appointment. (R. 325-28.)  Plaintiff reported thinking more clearly, sleeping 4-6 hours a night and taking a one-hour nap during the day.  (Id.)  Plaintiff was practicing yoga and wanted to enroll in a yoga class to alleviate his stress.  (Id.)

---

[30] It does not appear as though Dr. Gilmore repeated Plaintiff's neuropsychological testing. The only neuropsychological evaluation in the record was conducted on August 29, 1995, several months after Plaintiff's operation.  (R. 171-77.)

At his February 21, 2002 appointment, Plaintiff reported no further auras or seizures.  (R. 321.)  On April 11, 2002, Plaintiff reported a seizure on March 19, 2002 that was preceded by an aura.  (R. 317-20.)  Plaintiff reported that he started running again.  (*Id.*)

On September 5, 2002, Dr. Gilmore noted that Plaintiff's medication had been modified over the phone due to increasing auras.  (R. 313.)  Plaintiff reported having two auras since his medications were modified.  (*Id.*)  Plaintiff also reported having a seizure in May 2002.  (*Id.*)

On January 9, 2003, Dr. Gilmore noted that Plaintiff experienced one aura and no seizures during September, 2002, a grand mal seizure[31] and auras occurring every three weeks in October, 2002, one aura and no seizures in November, 2002.  (R. 311-12.)  Plaintiff did not experience any auras or seizures in December, 2002 but experienced an aura on January 3, 2003. (*Id.*)

At his July 17, 2003 appointment, Plaintiff reported that he experienced a seizure on May 2, 2003, which his wife described as convulsive.  (R. 329.)[32]  Plaintiff also reported complex partial seizures on June 15, 2003 and July 4, 2003, which were preceded by auras.  (*Id.*) Plaintiff reported that his auras were otherwise controlled with medication.  (*Id.*)  Plaintiff reported that his sleep and anxiety were improved.  (*Id.*)

---

[31] On October 15, 2002, Plaintiff went to the emergency room at Munroe Regional Medical Center, complaining of a grand mal seizure.  (R. 294-309.)

[32] The ALJ improperly stated that  as of July 17, 2003, Plaintiff had gone more than two months without a seizure.  (R. 19.)  The medical records show that Plaintiff reported a "convulsive" seizure on May 2, 2003 and partial complex seizures on June 15, 2003 and July 4, 2003.  (R. 329.)  Plaintiff also testified at the hearing that he had a seizure on August 17, 2003.  (R. 34, 36.)

In a report to the state agency on August 1, 2002, Denise Riley, Dr. Gilmore's Nurse Practitioner, noted that Plaintiff was diagnosed with intractable epilepsy and that he suffered from both major and minor motor seizures.  (R. 315-16.)  She noted that Plaintiff averaged one seizure per month and listed seizures occurring on September 13, 2001; October 25, 2001; November 5, 2001; December 12, 2001; March 19, 2002; April 2002, and two seizures in June 2002.  (*Id.*)  She noted that Plaintiff had daytime episodes, loss of consciousness, convulsive seizures, nocturnal episodes, alteration of awareness, transient postical manifestations of unconventional behavior and significant interference with activity during the day. (*Id.*)

There are two physical residual functional capacity ("RFC") assessments of record which were performed by non-examining state agency physicians. (R. 224-231, 274-81.)[33]  Based on the review of the medical records, the physicians found no exertional limitations (R. 225-26, 275-76) but determined that Plaintiff should never climb ladders/ropes or scaffolds (R. 226, 276) and that he should avoid concentrated exposure to hazards (i.e., machinery, heights, etc.) (R. 228, 278.)

There are also two mental residual functional capacity ("RFC") assessments of record which were performed by non-examining state agency clinical psychologists to evaluate Plaintiff's alleged organic mental disorder --i.e., memory impairment.    Val J. Bee, Psy. D., performed an assessment on September 6, 2001 (R. 206-223) and Steven L. Wise, Psy. D., performed an assessment on April 14, 2002.  (R. 257-73.)

---

[33] One assessment was dated October 17, 2001 but the name of the examining physician was illegible.  (R. 224-31.)  The other assessment was performed by Nicholas H. Bancks, M.D. on April 16, 2002.  (R. 274-81.)

Based on their review of the medical records, both Bee and Wise found that Plaintiff is moderately limited in his ability to understand, remember and carry out detailed instructions.  (R. 206, 257.)  They also found that Plaintiff is moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 207, 258.)  In addition, Bee found that Plaintiff is moderately limited in his ability to maintain attention and concentration for extended periods and in his ability to set realistic goals or make plans independently of others.  (R. 206.)   Wise concluded that Plaintiff's memory deficits "do not preclude at least simple tasks"  (R. 259), and  Bee concluded that Plaintiff "appears able to meet the mental demands of simple, well-structured task activity."  (R. 209.)

At the hearing, Plaintiff testified that he was having "about one seizure a month" and that his last seizure occurred on August 17, 2003.  (R. 34, 36.)  Plaintiff testified that after a seizure he is extremely tired and has a headache.  (R. 41.)   Plaintiff testified that he sleeps for a couple days following a seizure.  (*Id.*)  Plaintiff testified that since his lobectomy in 1995 he has had trouble with his short-term memory and concentration. (R. 40, 42.)

The ALJ determined that claimant suffers from seizure and organic mental disorders.  (R. 18.)   While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (*Id.*)   Specifically, the ALJ found that Plaintiff's seizure disorder is not of the severity described in Section 11.02 or 11.03 of the Listings of

Impairments and his organic mental disorder (a memory impairment) has not resulted in the marked limitations of function necessary to meet the criteria in Section 12.02 of the Listings of Impairments. (R. 18-19.)

The ALJ found that Plaintiff retains the physical RFC to sit, stand, walk, lift and carry without restriction, but his postural limitations restrict him from climbing ladders, ropes, or scaffolding, and his environmental limitations are that he should avoid concentrated exposure to working at heights or around machinery.  (R. 19, 21-22.)  The ALJ found that his nonexertional limitations restrict him to simple repetitive tasks generally associated with unskilled work. (R. 20, 22.)

The ALJ found that Plaintiff could not perform his past relevant work as a production planner. (R. 20.)  Based on Social Security Ruling 85-15, the ALJ concluded that Plaintiff had the physical RFC to perform unskilled work at all exertional levels.  (R. 22.)[34] The ALJ used Rule 204.00 of the Medical-Vocational Guidelines (the "grids")[35] as a "framework" and found that Plaintiff was not disabled because Plaintiff's nonexertional, postural and environmental limitations did not significantly compromise his ability to perform unskilled work at all exertional levels. (*Id.*)  The ALJ did not consult a vocational expert.

## V. DISCUSSION

---

[34] The ALJ paraphrased the portion of SSR 85-15 that provides where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work.   These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

[35] 20 CFR Pt. 404, Subpt. P. App.2 Rule 204.00.

A.    The ALJ's conclusion that Plaintiff's seizure disorder does not meet Section 11.02 of the Listings is supported by substantial evidence.

The ALJ found that Plaintiff's seizure disorder "is not of the severity described in Section 11.02[36] or 11.03."[37]  (R. 18-19.)[38]  Plaintiff argues that the ALJ erred by failing to make adequate findings as to why Plaintiff's seizure disorder does not meet Section 11.02 of the Listings.  Specifically, Plaintiff contends that the ALJ failed to determine whether his seizures were gran mal or petit mal and he failed to discuss whether Plaintiff's approximate average of one seizure a month was sufficient to meet Section 11.02.

The listing of impairments in the Social Security Regulations identifies impairments which are considered severe enough to prevent a person from gainful activity.  By meeting a listed impairment or otherwise establishing an equivalence, a Plaintiff is presumptively determined to be disabled regardless of his age, education, or work experience.  Thus, an ALJ's sequential evaluation of a claim ends if the claimant

---

[36]

11.02    Epilepsy -- *convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.*  With:
    A.    Daytime episodes (loss of consciousness and convulsive seizures) or
    B.    Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

[37]

11.03 *Epilepsy -- nonconvulsive epilepsy (petit mal, psychomotor or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.*  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

[38] The ALJ also found that Plaintiff's organic mental disorder (memory impairment) does not meet Section 12.02 of the Listings.  (R. 18-19.)  Plaintiff does not challenge this finding on appeal.

can establish the existence of a listed impairment.[39]  However, at this stage of the

evaluation process, the burden is on the plaintiff to prove that he or she is disabled.[40]

In this Circuit, a plaintiff must present specific findings that meet the various tests listed

under the applicable listing.[41]  Mere diagnosis of a listed impairment is not enough as

the record must contain corroborative medical evidence supported by clinical and

laboratory findings.[42]

Plaintiff bore the burden of proving that he met or equaled a listed impairment,

and, in order to do so, Plaintiff had to meet all of the requirements of the listed

impairment.  Plaintiff contends that he "may" meet the requirements of Section 11.02 of

the listing of impairments, which describes epilepsy characterized by grand mal[43] or

psychomotor seizures.  However, Plaintiff failed to establish that he experiences

seizures with the frequency required by this section -- i.e., more frequently than once a

month.

Plaintiff does not argue that he had more than one seizure each and every

month.  Rather, he argues that the frequency requirement of Section 11.02 could be

met in this case by averaging the number of seizures Plaintiff had from July 2001

through July 2003.  By way of example, if Plaintiff had twelve seizures in January and

---

[39] *See* Edwards v. Heckler, 736 F.2d 625, 628 (11th Cir. 1984).

[40] *See* Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).

[41] See *Bell*, 796 F.2d at 1353.

[42] *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[43] A grand mal seizure is one in which there are severe convulsions and loss of consciousness or even coma.  *See* 2-E Attorneys' Dictionary of Medicine 3148.

twelve seizures in June, he would average 2 seizures per month over a twelve month period. However, by its plain terms, Section 11.02 is met only if Plaintiff has seizures "occurring more frequently than once a month." This means that Plaintiff would have to have at least two grand mal or psychomotor seizures a month during a continuous twelve month period in order to meet Section 11.02.[44]

Plaintiff testified that he was averaging "about one seizure a month." (R. ). Likewise, in her report to the State, Nurse Practitioner Riley reported that Plaintiff averaged one seizure per month. (R. .) The medical evidence shows that from the alleged disability onset date -- July 3, 2001 -- Plaintiff did not suffer from two or more seizures each month. In fact, the records show that Plaintiff did not suffer even one seizure every month. The records show seizures, auras or other related events on the following dates: August 11, 2001 (seizure); September 2001 ("nocturnal event" and aborted seizure); October 25, 2001(aura and possible seizure); November 5, 2001 (aura and possible seizure); December 12, 2001 (seizure); March 19, 2002 (seizure); April 2002 (seizure), May 2002 (seizure); June 2002 (2 seizures); September 2002 (multiple auras and possible seizure); October 2002 (one seizure and multiple auras); November 2002 (one aura); January 3, 2003 (aura); May 2, 2003 (seizure); June 15, 2003 (seizure); July 4, 2003 (seizure); and August 17, 2003 (seizure).[45]   Even if the Court

_____

[44] Pursuant to 20 C.F.R. §404.1525(a) and 416.925(a), the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.

[45] The Court has included every reported seizure even though there are some inconsistencies in the record. For example, at his September 5, 2002 appointment, Plaintiff reported that his last seizure occurred in May 2002. (R. 313.) However, in her report to the State, Nurse Practitioner Riley noted that Plaintiff had two seizures in June 2002. (R. 315.)

averaged Plaintiff's seizures as Plaintiff suggests, it would not equal two or more seizures per month for a continuous twelve month period.

There was no need for the ALJ to make a finding as to whether Plaintiff's seizures were grand mal or petit mal because Plaintiff could not meet the frequency requirements under either Section 11.02 or Section 11.03.  The evidence does not show that Plaintiff suffered from grand mal seizures occurring more frequently than once a month or that he suffered from petit mal seizures occurring more frequently than once weekly.

Additionally, Plaintiff cites two Tenth Circuit cases to support his contention that the ALJ failed to adequately explain why Plaintiff's seizure disorder did not meet a listing.[46]  In both Drapeau v. Massanari and Clifton v. Chater, the Tenth Circuit reversed at step three because the ALJ reached the "bare conclusion" that the claimant's impairments did not meet or equal any listed impairment without any discussion.  Here, the ALJ identified what listing he was applying and concluded that Plaintiff's seizure disorder was not of the required "severity."  Additionally, the ALJ reviewed the pertinent medical evidence in the paragraphs immediately preceding his conclusion regarding the listing and again during his evaluation of Plaintiff's RFC.

Accordingly, the ALJ's finding that Plaintiff's seizure disorder does not meet Section 11.02 of the Listings is supported by substantial evidence.

### B.      The ALJ erred by relying exclusively on the grids

---

[46] See Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)(finding reversible error where ALJ simply stated that he "concurred with Dr. Pearson that [claimant] did not meet the criteria of any listing); Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996)(finding ALJ's bare conclusion that claimant's impairments did not meet or equal any listing was beyond judicial review).

Because the ALJ found that Plaintiff could not return to his past relevant work, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[47]  The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony.[48]  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.[49]

In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[50]  This burden may sometimes be met through exclusive reliance on the "grids."[51]  However, exclusive reliance on the "grids" is not appropriate "*either* when a claimant is unable to perform a full range of work at a given residual functional level or when a

---

[47] *See* Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[48] *See* id.

[49] *See* id.

[50] *See* Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[51] Foote, 67 F.3d at 1558.

claimant has non-exertional impairments that significantly limit basic work skills."[52]  If either condition exists, the ALJ is required to consult a vocational expert.[53]

Plaintiff argues that the ALJ was required to consult a vocational expert because the Plaintiff's nonexertional limitations caused by his seizure disorder and organic mental disorder significantly limit his basic work skills.[54]  The Commissioner counters that the ALJ's reliance on the grids was appropriate in this case because Social Security Ruling ("SSR") 85-15 and the grid regulations recognize that individuals who can perform work at all exertional levels and who have only environmental and postural limitations can perform a significant range of work.[55]

The ALJ found that Plaintiff retained the RFC to perform unskilled work at all exertional levels, except for work involving climbing ladders, ropes or scaffolding and concentrated exposure to working at heights or around machinery.  (R. 21-22.)  The ALJ also found that Plaintiff's nonexertional limitations restricted him to simple repetitive tasks generally associated with unskilled work.  (R. 22.)  The ALJ found that Plaintiff's postural, environmental and nonexertional limitations "somewhat erode[d]" the occupational base. (*Id.*)

Nevertheless, the ALJ concluded that Plaintiff's nonexertional, postural and environmental limitations did not significantly compromise his ability to perform unskilled

---

[52] *See* Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004)(quoting Francis v. Heckler, 749 F.2d 2565, 1566 (11th Cir. 1985.)

[53] *See* id.

[54] *See* Doc. 15 at 15-18.

[55] *See* Doc. 17 at 14.

work at all exertional levels.  (R. 22.)  In reaching this conclusion, the ALJ paraphrased

the following portion of SSR 85-15:[56]

> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute
> the potential occupational base for persons who can meet the mental demands of
> unskilled work.   These jobs ordinarily involve dealing primarily with objects, rather than
> with data or people, and they generally provide substantial vocational opportunity for
> persons with solely mental impairments who retain the capacity to meet the intellectual
> and emotional demands of such jobs on a sustained basis.

The ALJ then used Rule 204 of the grids as a framework to reach the conclusion

that Plaintiff is not disabled.  (R. 21.)  Rule 204 provides in pertinent part that "an

impairment which does not preclude heavy work (or very heavy work) would not

ordinarily be the primary reason for unemployment, and generally is sufficient for a

finding of not disabled. . ." [57]  It further provides that "[e]nvironmental restrictions

ordinarily would not significantly affect the range of work existing in the national

economy for individuals with the physical capability for heave work (or very heavy

work)."[58]  The ALJ did not provide any further explanation for his conclusion.

If Plaintiff only had postural limitations or environmental restrictions, then it might

have been proper for the ALJ to rely solely on SSR 85-15 and the "grid" regulations.[59]

---

[56] SSR 85-15 is entitled *Capability To Do Other Work -- The Medical-Vocational Rules As A
Framework For Evaluating Solely Nonexertional Impairments.*  It "clarifies policies applicable in cases
involving the evaluation of solely nonexertional impairments" including mental impairments, postural-
manipulative impairments, hearing impairments, visual impairments and environmental restrictions.

[57] 20 CFR Pt. 404, Subpt. P.App. 2 Rule 204.00.

[58] Id.

[59] In her brief, the Commissioner quotes portions of SSR 85-15 (which were not referenced by the
ALJ) addressing postural-manipulative impairments and environmental restrictions.  (Doc. 17 at 13-14.)
With respect to postural-manipulative impairments, the SSR provides that "limitations in climbing and
balancing can have varying effects on the occupational base . . . where a person has some limitation in
climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the
broad world of work."  As for environmental restrictions, the SSR notes that "[a] person with a seizure
(continued...)

However, in addition to his postural limitations and environmental restrictions, Plaintiff has nonexertional limitations caused by his seizure disorder and organic mental disorder.  These nonexertional limitations were not adequately addressed by the SSR or the regulations.

        With respect to Plaintiff's seizure disorder, the ALJ acknowledged Plaintiff's history of seizures.  (R. 18, 19.)  In addition to the seizures themselves, Plaintiff reported that after seizures he is extremely tired and has to rest for up to two days. (R. 41, 150.)   He also reported suffering from headaches after seizures.  (R. 41, 150.) Nurse Riley reported that Plaintiff's seizures cause a "significant interference with activities during the day."  (R. 316.)  There is also evidence that Plaintiff has become agitated and even violent during the postictal period.  (R. 150, 245-47.)[60]   With respect to Plaintiff's organic mental disorder, the ALJ found that Plaintiff was limited to simple repetitive tasks based on his memory impairment.  While Plaintiff's seizure disorder and organic mental disorder may not meet the technical requirements of the Listings, they could certainly limit Plaintiff's ability to perform basic work skills.[61]

        Because SSR 85-15 and the "grid" regulations did not adequately address Plaintiff's combined postural, environmental and nonexertional limitations, the ALJ was

---

[59](...continued)
disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone who environmental restriction does not have a significant effect on work that exist at all exertional levels."

[60] While the ALJ discredited Plaintiff's subjective complaints regarding his seizures, he did not make any specific findings regarding Plaintiff's complaints of fatigue, headaches or agitation in the postictal period.  (R. 19.)  Plaintiff does not challenge the ALJ's findings regarding his subjective complaints.

[61] Cf. Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)(finding that while seizures "may not be totally disruptive in a home environment, [they] could hardly be accommodated in the workplace.")

required to obtain vocational expert testimony.   Accordingly, this matter is due to be remanded for the ALJ to reconsider, with vocational expert testimony, whether Plaintiff can perform other work which exists in the national economy.

## VI. <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to reconsider, with vocational expert testimony, whether Plaintiff can perform other work in the national economy, and to conduct any additional proceedings the Commissioner deems appropriate.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on this 22nd  day of September, 2005.


GARY R. JONES
United States Magistrate Judge

Copies to:
        All Counsel

21